IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PAUL ABBOTT, et al.

v.                          :   Civil Action NO. DKC 09-0372

CHERYL R. GORDON, et al.

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this case involving a claim of tortious interference with prospective advantage are motions filed by Plaintiffs Paul Abbott and Dr. Elaine Barker to compel deposition testimony and for leave to request production of documents (ECF No. 39), and by Defendants Cheryl R. Gordon-Zupancic and John M. Zupancic, III, for summary judgment (ECF No. 40). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Plaintiffs' motion will be denied and Defendants' motion will be granted.

## I. Background

Following the court's prior grant of Defendants' motion to dismiss (ECF Nos. 10, 11), the only remaining claim in this case is one for tortious interference with prospective advantage relating to conduct alleged to have occurred after February 17, 2006. Although a discussion of the factual background occurring

prior to that date is necessary to frame the relevant issues, the proper focus of the litigation, at present, is on events occurring from February 18, 2006, through February 17, 2009, the date the complaint was filed.

**A.    Factual Background**

**1.    On or Before February 17, 2006**

The following facts are undisputed, uncontroverted, or construed in a light most favorable to Plaintiffs.  On April 24, 2004, Plaintiffs Paul Abbott and Dr. Elaine Barker entered into a contract with Catherine Bartos to purchase a parcel of real property in Scotland, Maryland ("the Property").  The Property is located on the Potomac waterfront in an area designated by the State of Maryland as environmentally critical.  In September 2003, an existing cottage on the Property was severely damaged by Hurricane Isabel and condemned by St. Mary's County ("the County").  Plaintiffs agreed to purchase the Property, in "as is" condition, for $75,000 and paid a $3,000 down payment.  The contract described the Property as "Lot 15 and one-half (1/2) of Lot 14, Section 1, plat 2/66, Cornfield Harbor (13945 Cornfield Harbor Dr., Scotland, MD)."  (ECF No. 40, Ex. 6).[1]  The seller,

---

[1] Dr. Barker testified at a prior proceeding that Ms. Bartos and a neighbor had jointly purchased the lot between their properties and agreed to split it "so that no one would ever build a cottage between their two cottages."  (ECF No. 45, Ex. 1, at E. 0048).  Ms. Bartos' half of that lot was "the one half of lot fourteen . . . referenced in [the] contract."  (*Id.*).

Ms. Bartos, warranted that "[w]ell and septic meet all applicable health and environmental requirements," and the contract was contingent on Plaintiffs obtaining an "[a]n approved building permit for property of similar size – acceptable to purchasers." (*Id.*).

Even before the contract was signed, Plaintiffs spoke with the County's Department of Land Use and Growth Management ("LUGM") and Health Department regarding obtaining a permit to rebuild on the Property. (ECF No. 45, Ex. 1, at E. 0048; Ex. 5, at 42-43). Dr. Barker's primary contact at LUGM was with Yvonne Chaillet, a planning and zoning administrator, related to the requirements for rebuilding in an environmentally critical area. (ECF No. 45, Ex. 5, at 45). In mid to late June 2004, Plaintiffs contracted with a surveying company, Nokleby Surveying, Inc., to "draw a plat and represent on that plat the property as it had been . . . and the property for purposes of rebuilding." (ECF No. 45, Ex. 1, at E. 0056).

The contract called for settlement to take place within one hundred twenty days, but it soon became apparent to Plaintiffs that they would not be able to obtain a building permit within that time frame. Consequently, Plaintiffs requested an extension of the settlement date. On June 24, 2004, Plaintiffs and Ms. Bartos executed an addendum to the contract, extending the settlement to "[seven] months from the date of this signed

agreement [*i.e.*, to January 24, 2005] or as soon as [Plaintiffs] are able to obtain a building permit, which they shall diligently pursue." (ECF No. 40, Ex. 7). The addendum further provided that "Seller understands the need for and grants permission to the Purchasers to arrange for soil tests to be conducted for pilings, which St. Mary's County requires for rebuilding or for any new construction on the property." (*Id.*)

On or about July 13, 2004, Defendant Cheryl R. Gordon-Zupancic contacted Ms. Bartos, by telephone, expressing the interest of herself and her husband, Defendant John M. Zupancic, III, in purchasing the Property. Ms. Bartos advised Ms. Gordon-Zupancic of the existing contract with Plaintiffs. The following day, Ms. Gordon-Zupancic sent a letter to Ms. Bartos suggesting that "it might be a good idea to do a back up contract" with Defendants, which would be "more favorable than [her] current offer" and would not require "contingency studies and the like." (ECF No. 45, Ex. 14). Soon thereafter, Defendants retained the services of an attorney, Nathan Finkelstein, to assist them in drafting a contract. On or about September 13, 2004, Mr. Finkelstein contacted Ms. Bartos on behalf of Defendants, and followed-up with a letter requesting a copy of the original contract "so that we can make certain that our back-up contract conforms with the terms of that Agreement." (ECF No. 45, Ex. 16). On or about September 19, 2004, Ms.

Gordon-Zupancic sent Ms. Bartos a copy of Defendants' contract ("the back-up contract") along with a cover letter indicating that she "might have some news to report on the building permit progress of the primary couple," referencing a publicly-available website that would allow her to monitor the status of any building permit application on the Property. (ECF No. 45, Ex. 18).

On September 30, 2004, Plaintiffs submitted their building permit application to the County's LUGM office, which shared the application, electronically, with the County's Health Department and Soil Conservation District. In order for a building permit to issue, all three of these governmental divisions were required to approve the application. Moreover, because the Property was located in an environmentally critical area, the State of Maryland's Critical Area Commission was required to approve any variance from existing zoning regulations.

Glynnis Schmidt, who was responsible for processing Plaintiffs' application for the County's Health Department, began her review on October 5, 2004. She observed that the application was missing required documentation, discovered that there was no record on file of the septic system and well on the Property, and determined that a site visit was necessary to "check [septic] tank construction." (ECF No. 40, Ex. 9, at St. M HD 000033). On October 15, Ms. Schmidt contacted Dr. Barker

and requested certain drawings "showing the existing cottage and proposed house, with measurements," and placed Plaintiffs' application "on hold until [a] drawing is provided." (*Id.*).

At around this time, Plaintiffs began experiencing delays in obtaining information from Ms. Bartos related to their building permit application. After learning from Ms. Schmidt that the Health Department needed further documentation regarding the septic system, Plaintiffs asked Ms. Bartos to provide a copy of a utility bill. It took Ms. Bartos "over a month" to provide the requested bill, "as opposed to a week or so for the other information that she [had previously] provided." (ECF No. 40, Ex. 1, at E. 0071). In her frequent discussions with Dr. Barker at around this time, Ms. Bartos began inquiring as to whether Plaintiffs wanted to rescind the contract. (*Id.* at 0082-83). Dr. Barker assured her that they did not.

On or about October 19, 2004, unbeknownst to Plaintiffs, Ms. Bartos and Defendants executed the back-up contract for the sale of the Property to Defendants in the event that the primary contract between Plaintiffs and Ms. Bartos failed to settle. (ECF No. 45, Ex. 6). Defendants agreed to pay $100,000 in cash at settlement, without contingency, and paid a $5,000 down payment, which was held in escrow by Mr. Finkelstein. Under the back-up contract, settlement was to occur "at the earlier of

Forty Five (45 days) after Notice is given to [Plaintiffs] that the Primary Contract herein has been voided and released, or Forty Five (45) Days after January 24, 2005 when the Primary Contract has lapsed and a release has been obtained." (*Id*. at ¶ 3). It also precluded Ms. Bartos from agreeing to any further extension of the closing date with Plaintiffs beyond January 24, 2005. (*Id*. at ¶ 11.3).

On or about October 26, 2004, Plaintiffs received a letter, purportedly from "Jerry P. Blackburn, Esq.," on behalf of an organization called "Friends of Cornfield Harbor, LLC," expressing concern with regard to their plans to rebuild on the Property and vowing "to do everything within [its] power, legally and otherwise, to block such new construction." (ECF No. 45, Ex. 19).[2] Citing the commitment of this organization to preserving the habitat of local wildlife, and its "long-standing record of success in slowing and/or preventing destruction/development in the Chesapeake Bay region," the letter threatened "aggressive action" against Plaintiffs if they did not reconsider their plans to rebuild. (*Id*.).

At around the same time, Plaintiffs learned that they needed to obtain a critical area variance from the St. Mary's

---

[2] Plaintiffs contend that this letter, and all others purportedly sent by community groups, was actually sent by Defendants. They attach the report of a linguistic expert in support of this claim. (ECF No. 45, Ex. 23).

County Board of Appeals ("Board of Appeals") in order to be eligible for a building permit. When they advised Ms. Bartos of this fact, she offered to rescind the contract, refund their deposit, and pay a portion of their subsequent expenses. Plaintiffs declined. Instead, on November 1, 2004, they filed with the LUGM office a request for an administrative variance to allow them to construct a replacement single family home on the Property. (ECF No. 40, Ex. 4, at PAEB004077; Ex. 3, at 7-17).

Ms. Chaillet reviewed Plaintiffs' variance request and, on or about November 10, 2004, drafted a memorandum containing a recommended motion in favor of it, which LUGM staff would make before the Board of Appeals at a hearing on November 18. (ECF No. 40, Ex. 4, at PAEB004067). Plaintiffs complied with a requirement that they post notice of the variance request and the upcoming hearing on the Property. Also on November 10, Ms. Chaillet and Susan Mahoney, another LUGM employee, received a letter from "Concerned Citizens of the Cornfield Harbor Neighborhood" complaining that the posting on the Property was "misinforming and misleading," that the "variance seeker" had not complied with certain notification requirements, and requesting that the hearing be rescheduled. (ECF No. 45, Ex. 21).

On November 15, 2004, Ms. Schmidt performed her planned site visit and learned from a neighbor that he had helped Ms.

Bartos' late husband install an unapproved, hand-made septic tank on the Property in the 1980s. (ECF No. 40, Ex. 9, at St. M HD 000033). Upon inspecting the septic tank, Ms. Schmidt determined that it would be necessary to review a surveyed site plan and that the "bootlegged" septic tank would need to be replaced before the Health Department could approve a building permit. (*Id*. at St. M HD 00034). Ms. Schmidt spoke with Dr. Barker the following day and advised her that the Health Department was "requiring a surveyed site plan" showing "existing house, septic, well, and drainfield, proposed footprint moved to 10' from the existing drainfield, location of new 2,000g septic tank, and possibly a new well." (*Id*.). She followed-up with a memorandum to Dr. Barker explaining "the reasons why, at this time, the St. Mary's Health Department cannot offer approval of the proposed house replacement" on the Property "and the review process is currently on hold." (ECF No. 40, Ex. 9, at St. M HD 000024). After explaining the problems with the septic system, the drainfield, and the necessity of a surveyed site plan, Ms. Schmidt opined that "the house replacement plans may not be feasible" due to limitations imposed by the location of the existing well and critical area requirements. (*Id*. at St. M HD 000025).

Upon learning of the Health Department's findings, Ms. Chaillet contacted Dr. Barker and advised her that the problems

with the septic system would necessitate postponement of the hearing before the Board of Appeals. The variance hearing was removed from the November 18 docket, and Ms. Chaillet told Plaintiffs that it could not be rescheduled until February 2005, at the earliest.[3] To date, it has not been rescheduled.

On November 23, 2004, Plaintiffs met with Ms. Schmidt to discuss their plans going forward. In a follow-up letter dated November 30, Ms. Schmidt summarized what was discussed at that meeting, stating, "[i]n order for our review to resume, you need to have a Maryland-registered surveyor submit a site plan to our office." (ECF No. 40, Ex. 9, at St. M HD 000022). The letter further indicated "the items necessary for building permit approval" as being submission of an appropriate "surveyed site plan" and a "septic tank replacement application and fee submitted to our office from a licensed septic contractor." (*Id.*).

On November 30, Ms. Chaillet and another LUGM employee received an email from "James Brownley, Jr.," on behalf of "The Citizens of Cornfield Harbor Drive." (ECF No. 45, Ex. 22). The letter stated that Mr. Abbott had been "aggressive and rude to

_____

[3] At her deposition, Dr. Barker testified that the problem with the septic system had been "misrepresented by Mrs. Bartos." She conceded that this problem "knocked everything off the Board of Appeals process" and that Defendants' conduct did not "tie into [Plaintiffs'] . . . case having been removed from the Critical Area Board of Appeals docket." (ECF No. 40, Ex. 1, at 223-24).

neighbors and dishonestly presented himself as the owner of the property," that he was "preying on elderly property owners," and that he planned to rebuild on the Property and illegally sell it for profit. (*Id.* at 2). The portion of the email relating to Mr. Abbott – another developer was also targeted – concluded by asking, "How are you planning to prevent this from happening?" (*Id.*).

In early December, Plaintiffs contacted Ms. Bartos to advise her that the critical area variance hearing could not be rescheduled until at least February 2005. Ms. Bartos refused to extend the settlement date beyond January 24, 2005. She told Plaintiffs, for the first time, that "she had [a] back up contract" and that "[Mr.] Finkelstein told her the back up buyers would sue her if she extended her contract with [Plaintiffs] past January [24, 2005], because the back up buyers had the right to purchase the property if we didn't go to settlement" by that date. (ECF No. 45, Ex. 1, at E. 0084).

Concerned that they might lose the Property to Defendants, Plaintiffs decided to waive the contractual contingency that they obtain a building permit and proceed immediately to settlement. Following a discussion with Ms. Bartos on January 12, 2005, settlement was scheduled for Friday, January 21, at 4:00 p.m., at the Law Office of Harris & Capristo, in California, Maryland. On January 13, Plaintiffs sent a letter

to Mr. Finkelstein advising that they were closing on the
Property the following week in light of the fact that Ms. Bartos
was "being pressured by the people with the back-up contract to
go to settlement as soon as possible" and "to avoid any
potential litigation, with either [Ms.] Bartos or [Defendants]."
(ECF No. 45, Ex. 26).[4]

Upon arriving at the law office on the settlement date,
Plaintiffs learned that their attorney, F. Michael Harris, had
received a facsimile earlier on the same date from "Jerry P.
Blackburn" and "Friends of Cornfield Harbor, LLC," alleging,
*inter alia*, the existence of a *lis pendens* on the Property.
(ECF No. 45, Ex. 27).[5] Mr. Harris explained to Plaintiffs that
the letter presented a potentially serious issue requiring
further investigation, but that he would be unable to check the
relevant land records until the next business day – Monday,
January 24, 2005, the deadline for settlement of Plaintiffs'
contract with Ms. Bartos. He suggested that Plaintiffs sign the
settlement documents and provide him with the purchase funds,
which he would hold in escrow until the *lis pendens* allegation

---

[4] The letter references a prior conversation between Dr.
Barker and Mr. Finkelstein taking place on December 29, 2004.

[5] A *lis pendens* is a "notice, recorded in the chain of title
to real property . . . to warn all persons that certain property
is the subject matter of litigation, and that any interests
acquired during the pendency of the suit are subject to its
outcome." Black's Law Dictionary 1335 (8th ed. 2004).

could be investigated. Plaintiffs agreed to do so. When Ms. Bartos arrived, Mr. Harris explained the situation to her and suggested that she sign the deed, which he would also hold in escrow pending further investigation. Ms. Bartos refused, stating that she "wasn't interested in being in the same room" with Plaintiffs and "wasn't settling unless she received her check." (ECF No. 45, Ex. 1, at E. 0096-97). Plaintiffs were nevertheless determined to close on the Property. They signed all necessary paperwork and submitted two checks to Mr. Harris for the full amount of the purchase price.

On the morning of January 24, 2005, Mr. Harris made a final attempt to settle. He called Ms. Bartos and asked her to meet him at the courthouse, suggesting that he could then confirm his suspicion that there was no *lis pendens* action, she could sign the deed, and he could record it and distribute the purchase funds to her.[6] Ms. Bartos again refused, telling Mr. Harris that "the ship had left the dock" and "she had a back up contract and she wasn't going to be pushed around anymore." (ECF No. 45, Ex. 1, at E. 0220).

Later on the same date, Plaintiffs filed a complaint against Ms. Bartos in the Circuit Court for St. Mary's County

---

[6] It is undisputed that there was no *lis pendens* action against the Property. Plaintiffs contend that the letter from "Friends of Cornfield Harbor" was a ploy by Defendants to delay settlement beyond the deadline.

("the Abbott/Bartos litigation"). Plaintiffs requested specific performance of their contract and a declaratory judgment that they were not required to settle on the Property before the issuance of a building permit.

In the cover letter accompanying the copy of the complaint that he sent to Ms. Bartos, Mr. Harris indicated that the most recent "Friends of Cornfield Harbor" letter had identified another stumbling block for Plaintiffs' rebuilding efforts – namely, that the "one half of lot fourteen, section one" was "an illegal subdivision of land." (ECF No. 40, Ex. 27).[7] The letter acknowledged that "[t]his fact, in and of itself, requires correction, which my clients are willing to undertake," and further affirmed that Plaintiffs "remain ready, willing and able to settle with you prior to the issuance of a building permit." (*Id.*).

On February 10, 2005, Ms. Gordon-Zupancic sent a letter to Ms. Bartos expressing Defendants' support of her position in the pending law suit, referencing a "package of material" sent previously in aid of her defense, and attaching a proposed addendum to the back-up contract. (ECF No. 45, Ex. 38, at 2). On or about February 13, Ms. Bartos executed the addendum, which

---

[7] Ms. Chaillet testified at her deposition that a property subdivided by deed after March 19, 1978, has no building rights until it goes "through the process to become a lot of record . . . [by] the subdivision review process and recording a plat[.]" (ECF No. 40, Ex. 3, at 94-95).

provided, in relevant part, that the back-up contract "will remain effective from the date of the signing of this addendum until a court of law in the State of Maryland has judged that the Primary Contract is either VOIDED, EXPIRED or it has been determined that Seller does not have to settle with Primary Contract Holders." (ECF No. 45, Ex. 39). Thus, under the terms of the addendum, Ms. Bartos was required to obtain a final determination on the merits of the Abbott/Bartos litigation.

On November 3, 2005, Ms. Bartos filed a separate declaratory judgment action against Defendants in the Circuit Court for St. Mary's County ("the Bartos/Zupancic litigation"), asking the court to:

> Declare that [Ms. Bartos], regardless of any language contained in the Back-up Contract and Addendum to the contrary, has the right to enter into settlement negotiations and, if fruitful, to enter into a settlement agreement with [Plaintiffs] to sell them the Bartos Property, and that [she] will suffer no liability of any kind to Defendants if [she] does.

(ECF No. 45, Ex. 41, at 4). On November 17, 2005, Plaintiffs filed a third-party complaint against Defendants in the Bartos/Zupancic litigation, naming Ms. Bartos as co-plaintiff and seeking a declaratory judgment that the back-up contract was unenforceable. (ECF No. 45, Ex. 43).

## 2. After February 17, 2006

On February 27, 2006, Defendants filed a counterclaim against Ms. Bartos in the Bartos/Zupancic litigation seeking a declaratory judgment that the back-up contract was valid and enforceable and demanding specific enforcement. Defendants also moved to intervene in the Abbott/Bartos litigation and to consolidate that case with the Bartos/Zupancic litigation. Those motions were granted on March 30, 2006. Soon thereafter, Defendants filed a counterclaim against Plaintiffs, asking that Plaintiffs' contract with Ms. Bartos be declared null and void.

On July 12, 2006, following a three-day bench trial, the circuit court ruled in favor of Plaintiffs, finding:

> [The purchasers] did nothing wrong. They did everything they were suppose [sic] to do. They were ready, able and willing to settle. They had their money ready to pay. They had a right to have their attorney check the title to determine whether there was a cloud on it or not. They did not even have to go past the date of the settlement within the contract, within the addendum of the contract to do so. . . .
>
> Mrs. Bartos made up her mind to demand her check in spite of the title issues, and to not come back, not to sign anything and put it in escrow and not to come back on Monday. And basically . . . the sale didn't go through because of Mrs. Bartos' [sic] behavior.

*Zupancic, III, et al. v. Abbott, et al.*, No. 916, September Term, 2006, slip op. at 18 (Md.App. Oct. 18, 2007) (quoting the

circuit court's oral decision). The court granted Plaintiffs' request for specific performance, ordering Ms. Bartos to "sign all documents effectuating the sale . . . within three [3] business days of same being presented to [her] attorney by Plaintiffs," and directing Plaintiffs to "tender the proceeds of the sale . . . immediately upon receipt of the signed documents." (ECF No. 40, Ex. 23). The order further provided that "upon exchange of the signed documents and proceeds of the sale" by and between Plaintiffs and Ms. Bartos, Defendants' back-up contract would "be rendered null and void." (*Id.*).

On July 17, 2006, Defendants filed a notice of appeal to the Court of Special Appeals of Maryland, along with a motion to stay the trial court's judgment. On July 19, the appellate court granted a temporary stay pending further review, but denied the motion to stay on July 28. Ms. Bartos filed her notice of appeal on August 11. Throughout the state court proceedings, Defendants were in regular contact with Ms. Bartos and, on or about October 2, 2006, they "loaned [her] $5,000.00 to pay attorney's fees for the appeal," which "was not repaid and subsequently forgiven" by Defendants. (ECF No. 45, Ex. 44; Ex. 46, at Ans. to Int. No. 9). On October 18, 2007, the Court of Special Appeals issued an unpublished opinion affirming the circuit court's decision. The appellate court's mandate was

issued on February 4, 2008. (ECF No. 45, Ex. 36, at Dkt. No. 136).

While the appeal was pending, Plaintiffs resumed their efforts to obtain a building permit on the Property. On October 13, 2006, Nokleby Surveying, Inc., on behalf of Plaintiffs, submitted an application for a confirmatory plat to LUGM in attempt to correct the illegal subdivision. LUGM determined that "the confirmatory plat was not the proper type of plan to submit for what the applicant wanted to do." (ECF No. 40, Ex. 3, at 130). By a memorandum dated February 2, 2007, LUGM advised Plaintiffs' surveyor that a boundary line adjustment plat was necessary. (ECF No. 40, Ex. 28). A boundary line adjustment plat was submitted on behalf of Plaintiffs on September 12, 2007, and was approved by LUGM on November 28, 2007. (ECF No. 40, Ex. 3, at 129).

On November 5, 2007, after the case on appeal had been decided, Mr. Zupancic sent a letter to LUGM Director Denis Canavan ("the Zupancic Letter"), asserting that the litigation was still ongoing and that the subject matter of the case "centers around the acquiring of a building permit, and the fact that the [P]roperty contains a portion that is an illegal parcel of record[.]" (ECF No. 45, Ex. 49, at 1). The letter further stated:

An important part of the lawsuit that is
ongoing revolves around the fact that the
property in question contains an illegal
parcel of record (Lot 14). . . . The
plaintiffs in the lawsuit's original
attorney, F. Michael Harris, who conducts
real estate settlements in St. Mary's
County[,] has stated on numerous occasions
that the "one half of lot fourteen, section
one, Cornfield Harbor[,] is an illegal
subdivision of land." . . .

We also ask that a great deal of care be
taken and that LUGM procedures and policies
are followed as closely as possible, as this
entire process may eventually endure a
microscopic level audit by the courts and/or
the attorneys involved in this litigation. .
. .

St. Mary's County LUGM is front and center
within the theatre of the ongoing litigation
regarding 13945 Cornfield Harbor Drive, and
in light of this, we want to ensure that the
policies and procedures regarding this
property's building permit and [boundary
line adjustment plat] processes are clearly
defined, and strictly adhered to.

(*Id.* at 2, 4). In or around January 2008, Defendants also

published a website dedicated to the state court litigation,

www.theretainercheck.com, on which they posted, *inter alia*, a

copy of the retainer check written by Dr. Bartos to Mr. Harris

and a copy of the deed to the Property. (ECF No. 45, Ex. 50;

Ex. 23, at 196). The website also contained an online message

board, "SoMa eCommunity Board," where Defendants posted opinions

and articles related to the litigation and the Property. (ECF

No. 45, Ex. 13, at 171-72; Ex. 23, at 195; Ex. 51).

On March 14, 2008, Plaintiffs presented Ms. Bartos' attorney, Christopher Longmore, with documents effecting the transfer of the Property. (ECF No. 40, Ex. 14, at 88). On the same date, Mr. Longmore executed the deed on behalf of Ms. Bartos, pursuant to a Power of Attorney.

Because their 2004 building permit application expired in 2006, Plaintiffs submitted a new application to the County on May 13, 2008. LUGM started a new file for this application and assigned it to Jennifer Ballard, an Environmental Planner who handled critical area building permits. On May 16, 2008, Nokleby submitted a surveyed site plan to the Health Department on Plaintiffs' behalf. After conducting an initial review and a site inspection, Ms. Ballard prepared two reports listing items that needed to be addressed in order for the rebuilding project to meet critical area and flood plain requirements. (ECF No. 40, Ex. 30, 31). Thereafter, Nokleby submitted a series of revised site plans, the last of which was approved for signature on October 8, 2008. To date, however, Plaintiffs have not addressed the problem with the Property's septic system, nor have they resolved the critical area variance issue. Consequently, they have not obtained a building permit.[8]

---

[8] At his April 2010 deposition, Mr. Abbott testified that Plaintiffs "haven't decided what to do with [the Property] now," and "[i]t's up in the air whether [they] will rebuild." (ECF No. 40, Ex. 11, at 23-24).

**B.    Procedural Background**

On February 17, 2009, Plaintiffs commenced this diversity action by filing a complaint alleging tortious interference with contract, tortious interference with prospective advantage, and defamation under Maryland law.  (ECF No. 1).  In response, Defendants moved to dismiss, contending, *inter alia*, that Plaintiffs' claims were barred by the applicable statutes of limitations.  (ECF No. 3).[9]  On August 6, 2009, the court issued a memorandum opinion and order granting in part and denying in part Defendants' motion.  (ECF Nos. 10, 11).  Specifically, the court found that the only claim not time-barred was one for tortious interference with prospective advantage related to events alleged to have occurred after February 17, 2006.[10]

---

[9] In their papers opposing this motion, Plaintiffs conceded that their defamation claim could not be sustained.  (ECF No. 8, at 9).

[10] On October 8, 2009, Plaintiffs filed a malpractice action in this court against Daniel Guenther, the attorney who represented them in the state trial court.  Their complaint alleged, in pertinent part:

> [D]espite Plaintiffs' having instructed [Mr.
> Guenther] to sue [Ms.] Bartos and the third
> party (Gordon and Zupancic) for tort[i]ous
> interference . . . [Mr. Guenther] advised
> Plaintiffs to drop any and all actions
> regarding tortious interference until after
> the final outcome of the lawsuit against
> [Ms.] Bartos was determined.

Defendants then answered the complaint (ECF No. 13), a scheduling order was issued (ECF No. 17), and the discovery process commenced.

On March 30, 2009, Defendants moved for a protective order seeking to preclude Plaintiffs from taking the deposition of Mr. Finkelstein, the attorney retained by Defendants to draft the back-up contract and addendum thereto. (ECF No. 32). The court denied that motion by an order dated April 9, 2010 (ECF No. 35); accordingly, Mr. Finkelstein's deposition was permitted to proceed. Plaintiffs subsequently moved to compel additional testimony from Mr. Finkelstein and for leave to request production of documents related to his communications with third parties. (ECF No. 39). That motion is presently pending, as is

---

> [Mr. Guenther] failed to tell Plaintiffs, as was his duty, that the statute of limitations for the breach of contract regarding Plaintiffs' contract with [Ms.] Bartos began on the date the contract was breached (January 21, 2005) and Defendant further failed in his duty by telling Plaintiffs that any statute applicable to tortious interference would only come into effect when the case had been finally determined.

Motion for Judgment, *Abbott, et al. v. Guenther*, Civ. No. RWT 09cv2642 (D.Md. Oct. 9, 2009), ECF No. 1. Judge Titus granted summary judgment in favor of Mr. Guenther on March 9, 2010. Plaintiffs' appeal of that decision is presently pending before the United States Court of Appeals for the Fourth Circuit.

22

Defendants' motion for summary judgment (ECF No. 40), which was filed shortly thereafter.

## II. Plaintiffs' Motion to Compel Deposition Testimony and for Leave to Request Production of Documents

The ongoing discovery dispute with regard to Defendants' former attorney, Nathan Finkelstein, arises from Defendants' production of a May 18, 2006, letter sent by Mr. Finkelstein to his former clients ("the Finkelstein Letter"). The letter states, in relevant part:

> I am responding to your inquiry as to whether or not I made a threat to [Plaintiff] Ellen Barker regarding the contract for your purchase of 13945 Cornfield Harbor Drive, Scotland, Maryland.
>
> On or about December 29, 2004, I received a telephone call from Ms. Barker. She told me that there was a septic system problem that had come up with the purchase of the property, and that it was necessary for them to get a variance from the board of appeals. The septic system problem was impeding their ability to get the variance. I then asked[] if a closing date had been set. She indicated "no," but went on to say that they were going to settle on January 24, 2005, or as soon as they were able to get building permits. She furthermore indicated that they had hired an attorney because the Health Department had indicated that the septic system did not meet any of the requirements for St. Mary's County.
>
> I subsequently received a letter from Ms. Barker and Mr. Abbott dated January 13, 2005. . . . As you can see from the [attached] letter, Ms. Barker had indicated that they were going to settlement on the above referenced property, which is 13945

Cornfield Harbor Drive. She further advised that the settlement was arranged for the next week. She understood that Ms. Bartos was being pressured by you to go to settlement as soon as possible and understood that I represented you. . . .

Clearly, in that letter she did not make any statement . . . that I had indicated that we would be filing a lawsuit against Ms. Bartos. I, of course, never made such threats because of the strategy that we had discuss[ed].

As I understood it, we expected that the settlement with Ms. Barker and Mr. Abbott would not take place on or before January 24, 2005, and that their contract would then be voided by their inability to settle. Your contract would then become the primary contract, and you were prepared to go forward with it as soon as possible.

Accordingly, the litigation that was threatened was by Ms. Barker and Mr. Abbott, when they said that they were prepared to "pursue whatever legal remedies maybe available for them."[11]

I understand that they were not able to go to settlement on January 24, 2005, and there is pending litigation regarding that issue. According to my recollection and based on my review of the file, there is no indication at any point that I represented to Ms. Barker and Mr. Abbott that you and Mr. Zupancic were prepared to file suit against Ms. Bartos. Further, that is not something that I would have discussed with Ms. Barker.

---

[11] Plaintiffs' letter of January 13, 2005, concludes by stating, "we reserve our rights to take whatever actions are necessary to fulfill the contract for the sale of the property and to pursue whatever legal remedies may be available to us." (ECF No. 45, Ex. 26).

(ECF No. 32, Attach. 3).

Plaintiffs subsequently issued a notice of deposition and subpoena to Defendants' former attorney. While the notice did not specify the topics designated for Mr. Finkelstein's deposition, nor did it command the witness to bring any documents with him, Plaintiffs orally represented to Defendants that they sought his testimony in relation to the conversations referenced in the Finkelstein Letter. Counsel for Plaintiffs further advised Defendants' counsel of his position that Defendants' production of the letter in response to their discovery request constituted a waiver of the attorney-client privilege between Defendants and Mr. Finkelstein.

On March 30, 2010, Defendants filed a motion for protective order seeking to "preclude[] Mr. Finkelstein's deposition because the inquiry sought would either be privileged, or, if not privileged, pertains to a conversation that occurred in December 2004, which is outside of the period relevant to this case[.]" (ECF No. 32, Attach. 1, at 2). In opposing that motion, Plaintiffs asserted:

> Mr. Finkelstein's deposition is important for several reasons. One, Mr. Finkelstein, by Defendants['] own admission, had numerous conversations with Ms. Bartos about Defendants' attempt to purchase the Property, despite the existence of Plaintiffs' Sale Contract. These conversations are highly relevant and not at all protected by the attorney-client

> privilege. Two, Defendants have raised the
> fact that Mr. Finkelstein had conversations
> with Plaintiff Elaine Barker. Plaintiffs
> have a right to know what Mr. Finkelstein
> claimed was being discussed during the
> calls. Again, this information is relevant
> and non-privileged. Third, Defendants
> produced a letter from Mr. Finkelstein dated
> May 18, 2006[,] and discussed its
> significance in Defendant Gordon-Zupancic's
> deposition. Defendants admit that this
> disclosure was not inadvertent and, thus,
> they have intentionally waived their
> attorney-client privilege as to issues
> raised in that letter.

(ECF No. 34, at 1-2). Plaintiffs further asserted that the
motion for protective order should be denied because while
Defendants claimed that "*all* of [Mr. Finkelstein's] testimony
will be subject to the attorney-client privilege, . . . the
privilege only protects communications between an attorney and
his or her clients." (*Id.* at 2 (emphasis in original)). Thus,
according to Plaintiffs, the privilege could not be invoked to
"protect communications between the attorney and third
parties[,] as in this case." (*Id.*).

In denying Defendants' motion for protective order, the
court found, in essence, that the dispute was based on a
misunderstanding between the parties:

> Notably, Plaintiffs do not argue that
> production of the May 18 letter constitutes
> a "blanket waiver," permitting inquiry into
> all matters that would otherwise be
> protected by the attorney-client privilege,
> as Defendants had anticipated. Rather, they
> essentially present alternative arguments

> that they are permitted to question Mr.
> Finkelstein about his communications with
> third parties while he represented
> Defendants. The first argument – *i.e.*, that
> Mr. Finkelstein's communications with
> Plaintiffs while he represented Defendants
> are not subject to the attorney-client
> privilege – is not contested by Defendants.
> Because the substance of the letter . . .
> relates exclusively to conversations Mr.
> Finkelstein had with third parties, the
> testimony sought by Plaintiffs involves
> communications that neither party claims is
> privileged. In that sense, there appears to
> be no real dispute, at least insofar as the
> scope of the scheduled deposition is
> concerned.

(ECF No. 35, at 7-8). Following a brief discussion of relevant
case law, the court determined that "the letter from Mr.
Finkelstein to Defendants was not protected by the attorney-
client privilege, and its production during the discovery
process could not constitute a waiver of the privilege." (*Id.*
at 10). Upon further finding that Defendants had "failed to
cite any extraordinary circumstances that would justify the
issuance of an order precluding Mr. Finkelstein's deposition,"
and that the attorney's testimony, though related to conduct
that itself was time-barred, "may nevertheless provide context
for similar acts alleged to have occurred [within the relevant
time frame]," the court declined to issue a protective order.
(*Id.* at 11). "[I]n light of Plaintiffs' representations in
opposing the instant motion," the court deemed it unnecessary to

issue an order limiting the scope of the deposition, as Defendants had requested in the alternative. (*Id*.).

Plaintiffs conducted Mr. Finkelstein's deposition on April 22, 2010. On May 4, they filed the pending motion to compel further deposition testimony and for leave to request production of documents, complaining that "Mr. Finkelstein was asked numerous questions about the Finkelstein Letter to which he refused to answer on attorney-client privilege grounds." (ECF No. 39, at 2). Despite the court's prior, unequivocal ruling as to waiver of the attorney-client privilege – *i.e.*, "the letter from Mr. Finkelstein to Defendants was not protected by the attorney-client privilege, and its production during the discovery process could not constitute a waiver of the privilege" (ECF No. 35, at 10) – Plaintiffs now argue that "Defendants' attorney-client privilege . . . was waived by [their] production of Mr. Finkelstein['s] Letter" (ECF No. 39, at 10). Thus, they contend that Mr. Finkelstein could not properly invoke the privilege in response to their questions. Because Mr. Finkelstein also "essentially claimed to have no memory as to any discussions he had with third parties," Plaintiffs argue that he "effectively and improperly thwarted [their] efforts to discover facts and circumstances surrounding the Finkelstein Letter and his conversations with [a] critical,

otherwise unavailable third-party in this case." (*Id.*).[12]  On those grounds, Plaintiffs seek an order compelling Mr. Finkelstein "to answer questions directly related to the Finkelstein Letter and provid[ing] . . . leave to seek Mr. Finkelstein's memorand[a] and other notes concerning his conversations with third-parties." (*Id.*).

In addition to misconstruing the plain language of the court's prior memorandum opinion and ignoring their own prior representations as to the scope of the deposition, Plaintiffs' motion also fails to comply with the relevant local rule regarding the filing of a discovery motion.  Local Rule 104.7 provides:

> Counsel shall confer with one another concerning a discovery dispute and make sincere attempts to resolve the differences between them.  The Court will not consider any discovery motion unless the moving party has filed a certificate reciting (a) the date, time and place of the discovery conference, and the names of all persons participating therein, or (b) counsel's attempts to hold such a conference without success; and (c) an itemization of the issues requiring resolution by the court.

*See also* Local Rule 104.8 ("as to disputes concerning discovery directed to a non-party, unless otherwise directed by the Court, the Court will not consider the motion until a conference has

---

[12]  The unavailable witness is Ms. Bartos, who died at some point after the deed was executed, but prior to the time Plaintiffs commenced this action.

been held under L.R. 104.8.b and a certificate has been filed under L.R. 104.8.c").

Plaintiffs have failed to attach the required certificate. Instead, they attach to their motion a printed email to counsel for Defendants, dated April 30, 2010, stating their objections to Mr. Finkelstein's refusal to answer questions based on the attorney-client privilege and requesting that "he produce any memoranda, notes, or other documentation he has that memorialize his conversations with third-parties, minus any mental impressions, which may be redacted." (ECF No. 39, Ex. D). In this email, Plaintiffs' counsel advises defense counsel that they should "let [him] know" if they "believe that this issue can be resolved without court intervention," and further states, "my intention is to file a Motion to Compel on Tuesday, May 4, 2010," if there is no prior "agreement as to the issues." (*Id*.). While Plaintiffs cite the email as being "[i]n accordance with Local Rule 104," it clearly is not. Nevertheless, because Plaintiffs' arguments may readily be dispensed with on the merits, the court declines to deny relief on procedural grounds. *See* Local Rule 604.

The transcript excerpts provided by Plaintiffs in support of their motion reveal that Mr. Finkelstein refused to respond to five questions based on the attorney-client privilege:

(1) In the context of a discussion regarding Mr. Finkelstein's contact with Ms. Bartos related to the purchase price of the back-up contract, Plaintiffs' counsel asked, "Do you recall how you determined to make an offer price of $100,000?" (ECF No. 39, Ex. C, at 4);

(2) During a discussion about Mr. Finkelstein's May 18, 2006, letter to Defendants, Plaintiffs' counsel pointed to a sentence in which Mr. Finkelstein wrote, "I, of course, never made such threats because of the strategy that we had discuss[ed]," and asked, "What is the strategy referred to in that sentence?" (*Id*. at 9);

(3) Referring to a sentence in the next paragraph of the same letter, in which Mr. Finkelstein recalls the strategy "as [he] understood it," Plaintiffs' counsel asked, "When you say 'as I understood it,' what was that understanding based upon?" (*Id*.);

(4) Referring to language in the "penultimate paragraph" of the letter in which Mr. Finkelstein wrote, "I understand that [Plaintiffs] were not able to go to settlement on January 24, 2005, and there is pending litigation regarding that issue," Plaintiffs' counsel asked, "How did you know . . . to write that in the letter?" (*Id*. at 10); and

(5) Plaintiff's counsel asked, "Do you know if you had any discussions with Ms. Gordon or Mr. Zupancic about this letter after you wrote it?" (*Id*. at 11).

Mr. Finkelstein properly invoked the privilege in response to these questions. Despite Plaintiffs' prior representations that they sought information regarding only non-privileged communications between Mr. Finkelstein and third parties, they

clearly asked for more during the deposition. Indeed, their counsel asked Defendants' former attorney to reveal the substance of his discussions with Defendants regarding the subject-matter of his representation and specifically inquired as to Defendants' strategy to acquire the Property. As discussed in the court's prior opinion, under Maryland law, "only those attorney-client communications pertaining to legal assistance and made with the intention of confidentiality are within the ambit of the privilege." *Newman v. State*, 384 Md. 285, 302 (2004) (quoting *E.I. du Pont de Nemours & Co. v. Forma-Pack, Inc.*, 351 Md. 396, 416 (1998)) (emphasis removed). Plainly, the above-cited questions by Plaintiffs' counsel sought responses that were privileged under that standard. Accordingly, Mr. Finkelstein properly invoked the attorney-client privilege and Plaintiffs' motion to compel his testimony will be denied.

Insofar as Plaintiffs seek leave to request production of documents – *i.e.*, memoranda and/or notes that Mr. Finkelstein may have written while questioning third party witnesses – that motion will also be denied. Initially, the subpoena Plaintiffs' counsel issued to Mr. Finkelstein was not a subpoena *duces tecum*; thus, the documents Plaintiffs now request, to the extent they were not privileged or protected work product, could have been inspected at the time of the deposition. Plaintiffs failed

to take advantage of that opportunity, however, and now seek to correct this apparent oversight after the fact. The discovery deadline in this case expired long ago; indeed, it was extended to permit Plaintiffs to take Mr. Finkelstein's deposition in the first place. Considering also that any memoranda prepared by Mr. Finkelstein related to his representation of Defendants necessarily related to events occurring prior to February 17, 2006, the documents sought by Plaintiffs would likely have little relevance to the litigation at present. Thus, to the extent that the requested documents exist and constitute non-opinion work product, Plaintiffs cannot establish a substantial need for them. *See National Union Fire Ins. Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992). Accordingly, their motion for leave to request production of documents will be denied.

**III. Motion for Summary Judgment**

    **A.   Standard of Review**

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder

33

of fact because they may reasonably be resolved in favor of either party," summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See Scott v. Harris*, 550 U.S. 372 (2007); *Emmett*, 532 F.3d at 297. A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. *Celotex Corp.*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id*. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 254; *Celotex Corp.*, 477 U.S. at 324. "A mere scintilla of proof, however, will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

**B. Analysis**

Under Maryland law, the tort of intentional interference with business relations has two manifestations: "the tort . . . is committed when a third party's intentional interference with another in his or her business or occupation induces a breach of an existing contract or, absent an existing contract, maliciously or wrongfully infringes upon an economic relationship." *Macklin v. Robert Logan Assocs.*, 334 Md. 287, 297 (1994). The two types of tort actions differ in terms of the amount of interference that is tolerated. "[W]here a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted. A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved." *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 69-70 (1984).

In their complaint, Plaintiffs raised both types of tortious interference claims. In the first count, alleging tortious interference with contract, Plaintiffs asserted that "Defendants . . . intentionally and improperly interfered with Plaintiffs' Sale Contract with Ms. Bartos, which led to Ms. Bartos' breach of said contract." (ECF No. 1, ¶ 63). That

count was subsequently dismissed as time-barred.  In the second count, for tortious interference with prospective advantage, Plaintiffs alleged that Defendants "intentionally and improperly interfered with Plaintiffs' relationship with Ms. Bartos and the County zoning authorities solely to disrupt the Sale Contract and Plaintiffs['] ability to replace the damaged home."  (*Id*. at ¶ 68).  That count survived Defendants' motion to dismiss, but only in part.  Specifically, the court found:

> Each alleged interference with Plaintiffs' prospective advantage constitutes a separate cause of action, with its own date of accrual.  Therefore, while not acting as a complete bar to count II, the statute of limitations does not allow the court to look to any of Defendants' actions occurring more than three years prior to the filing of this case. Accordingly, in determining whether Plaintiffs state a claim for which relief can be granted, the court will limit the analysis to Defendants' alleged actions occurring after February 17, 2006.

(ECF No. 10, at 16).  The court enumerated the surviving claims:

> Plaintiffs allege that Defendants engaged in numerous improper activities after February 17, 2006, that interfered with their prospective advantage:  (1) interfering in the Third-Party Litigation and hindering Plaintiffs' ability to settle on the Property; (2) publishing the website www.theretainercheck.com . . . ; (3) sending a letter to St. Mary's County, Maryland [*i.e.*, the Zupancic Letter] . . . ; and (4) attempting to hinder Plaintiffs' efforts to obtain a building permit by contacting and questioning Nokleby Surveying, a surveying company hired by Plaintiffs.  Plaintiffs

assert that this contact interfered with re-
recording the subdivision of a half-lot that
was part of the Property.  The re-recording
was required before Ms. Bartos could fully
transfer ownership of the Property to
Plaintiffs.

(*Id.* at 16-17) (footnote omitted).

In moving for summary judgment, Defendants argue that
Plaintiffs cannot prevail on these claims because (1) their
participation in the underlying litigation was not wrongful, and
(2) even assuming the Zupancic Letter, publication of the
website, and Defendants' contact with third parties were
wrongful, Plaintiffs have failed to show that such conduct
interfered with any business relation of Plaintiffs or that
damages resulted.  Plaintiffs counter that Defendants wrongfully
interfered in the state court litigation by "appealing and then
encouraging (and even secretly funding) Ms. Bartos to do the
same."  (ECF No. 45, at 42).  They further contend that there
are genuine disputes of material fact as to whether Defendants'
conduct impeded their ability to obtain a building permit,
thereby resulting in compensable damages.

In Maryland, the elements of tortious interference with
prospective advantage are: "(1) intentional and willful acts;
(2) calculated to cause damage to the plaintiff[s] in [their]
lawful business; (3) done with the unlawful purpose to cause
such damage and loss, without right or justifiable cause on the

part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *Carter v. Aramark Sports and Entm't Servs., Inc.*, 153 Md.App. 210, 240 (2003) (internal marks omitted) (quoting *Natural Design, Inc.*, 302 Md. At 71).  As the court recognized in *Carter*:

> [W]rongful or malicious interference with economic relations is interference by conduct that is independently wrongful or unlawful, quite apart from its effect on the plaintiff's business relationships. Wrongful acts include common law torts and violence or intimidation, defamation, injurious falsehood or other fraud, violations of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.

153 Md.App. at 241 (internal marks omitted) (quoting *Kramer v. Mayor and City Council of Baltimore*, 124 Md.App. 616, 638 (1999)).  "[T]o establish causation in a wrongful interference action, the plaintiff must prove that the defendant's wrongful or unlawful act caused the destruction of the business relationship which was the target of the interference." *Kaser v. Financial Protection Marketing, Inc.*, 376 Md. 621, 629 (2003) (quoting *Medical Mut. Liability Soc. of Maryland v. B. Dixon Evander and Assocs., Inc.*, 339 Md. 41, 54 (1995)).

1.  **Participation in and Promotion of the State Court Litigation**

The precise nature of Plaintiffs' argument with respect to the underlying litigation is somewhat difficult to pin down.

While it may or may not be the case that Defendants' conduct facilitated Ms. Bartos' breach of her contract with Plaintiffs, thereby necessitating Plaintiffs' filing of the state court action, the present focus of this action must be on whether any conduct by Defendants occurring after February 17, 2006, was independently wrongful. Thus, Plaintiffs' initial argument that "any efforts made [by Defendants] to promote Ms. Bartos' litigation efforts [thereafter] are poisoned by their original tortious conduct [before]" may not be considered. (ECF No. 45, at 39). *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges," but such acts may be used "as background evidence in support of a timely claim"). Along similar lines, Plaintiffs claim that Defendants "surreptitiously encouraged . . . Ms. Bartos' litigation efforts," citing the cover letter accompanying the addendum to the back-up contract and the subsequent execution of the addendum. (ECF No. 45, at 39). Both of those events also occurred outside of the relevant time frame. Plaintiffs further cite telephone records showing that Defendants and Ms. Bartos were in frequent contact throughout the litigation. They argue that, when considered alongside the time-barred letter, it may be inferred that the phone calls "were done with 'unlawful purpose.'" (*Id.* at 40).

Even if the letter was sent within the limitations period, however, the mere fact that phone calls were made, without any indication as to their substance, would be of little evidentiary value.

The only remaining evidence cited by Plaintiffs that is related to the litigation and not time-barred is Defendants' acknowledgement that they loaned Ms. Bartos $5,000 to fund her appeal and did not require her to repay the loan. Plaintiffs contend that this act constitutes "a classic case of tortious interference arising from the centuries old prohibition against 'officious intermeddling in a suit which in no way belongs to one, by maintaining or assisting either party, with money or otherwise,' which is known and prohibited at the common law as maintenance." (*Id.* (quoting *Schnabel v. Taft Broadcasting Co., Inc.*, 525 S.W.2d 819, 823 (Mo.App. 1975)).

"'Maintenance' consists in maintaining, supporting, or promoting the litigation of another." *Schackow v. Medical-Legal Consulting Service, Inc.*, 46 Md.App. 179, 195 (1980) (quoting Black's Law Dictionary (5th ed. 1979)). In Maryland, it has been found to exist "when a person 'without interest' in a suit officiously intermeddles by assisting either party[.]" *Schackow*, 46 Md.App. at 195 (quoting *Lahocki v. Contee Sand & Gravel Co.*, 41 Md.App. 579, 608 (1979), *rev'd on other grounds*

40

*sub nom.*, *General Motors Corp. v. Lahocki*, 286 Md. 714 (1980)).

The term was broadly construed under common law to include:

> "assist[ing] another with money to carry on his cause, as by retaining one to be of counsel for him, or otherwise bearing him out in the whole or part of the expense of the suit," saving a suitor from expense, as by persuading an attorney to represent the party *gratis*, and "endeavor[ing] to give, any other kind of assistance to either of the parties in the management of the suit depending between them."

*Son v. Margolius, Mallios, Davis, Rider & Tomar*, 349 Md. 441, 457 (1998) (quoting 1 W. Hawkins, Pleas of the Crown 455 (1824)). "The broad scope of common law maintenance," however, "did not survive beyond the mid-Nineteenth Century." *Son*, 349 Md. at 458; *see also American Hotel Management Associates, Inc. v. Jones*, 768 F.2d 562, 570 (4th Cir. 1985) ("most jurisdictions no longer recognize causes of action for damages based on champerty and maintenance. . . . [The] doctrine remains viable only as a defense in contract actions.").[13]

Nevertheless, "Maryland continues to reserve a policy against some of the originally prohibited conduct," and the "conduct once characterized as maintenance is now prohibited in Maryland under the label of barratry." *Accrued Financial Services, Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 298 (4th Cir.

---

[13] Notably, no reported Maryland decision since *Son*, in 1998, has addressed a claim of maintenance or champerty.

2002) (citing *Son*, 349 Md. at 458-59).  That prohibition has
been codified in the Business Occupations and Professions
Article of the Maryland Code, which provides, in relevant part,
that "[w]ithout an existing relationship or interest in an issue
. . . a person may not, for personal gain, solicit another
person to sue or to retain a lawyer to represent the other
person in a lawsuit."  Md. Code Ann., Bus. Occ. & Prof. § 10-
604(b)(1).[14]

Defendants cannot be liable under this standard because
they clearly had an interest in the state court litigation.  *See*
*Stewart v. Tuli*, 82 Md.App. 726, 730 (1990) (finding holders of
a back-up contract for real property "undoubtedly have an
interest in the subject matter of the action that could be lost
if not protected").[15]  It is undisputed that the circuit court

---

[14] "The conduct proscribed by § 10-604 was first made a
statutory offense in Maryland in 1908. . . . Before then, the
officious stirring up of, maintaining, or meddling in litigation
in which a person had no interest constituted the common law
crime of barratry, maintenance, champerty, or embracery,
depending on the particular nature of the conduct." *Son*, 349
Md. at 457.

[15] Even in the cases cited by Plaintiffs, involving
interpretations of maintenance and champerty in other
jurisdictions, the term applies only where the interfering party
did not have an interest in the litigation. *See Schnabel*, 525
S.W.2d at 824 ("[t]he modern doctrine takes out of the rule
against maintenance those who interfere in litigation in which
they have, or honestly believe they have, an interest") (quoting
*Breeden v. Frankfort Marine, Accident & Plate Glass Ins. Co.*,
119 S.W. 576, 606 (1909)); *American Hotel Management Associates,*
*Inc.*, 768 F.2d at 571 (where party "entered the fray to mitigate

42

granted Defendants' motion to intervene. Inherent in that
ruling is a finding that Defendants had a protectable interest.
*See Maryland-National Capital Park and Planning Commission v.*
*Town of Washington Grove*, 408 Md. 37, 75 (2009) ("[t]he
requirement which we have imposed on the applicant for
intervention . . . is that he have an interest for the
protection of which intervention is essential and which is not
otherwise protected."). "The intervention of a party whose
position may be adversely affected by the resolution of the
issues . . . does not comprise a separate action nor does it
make the intervenor an 'other' litigant. The intervenor is one
of *the* litigants in the case *sub judice*." *Hess Constr. Co. v.*
*Bd. of Educ. of Prince George's County*, 102 Md.App. 736, 754
(1995) (emphasis in original). Moreover, because "an intervenor
has all the rights as a party and a party has the right to
appeal, . . . [the intervenor] has the right to appeal."

---

the effect of a potential judgment" in another action, "[h]e
thus had a justification, a verifiable interest," and was not an
"'officious intermeddler' who walks in off the street simply to
stir up strife and litigation"); *In re Brown*, 354 B.R. 100, 105
(Bankr. N.D.W.Va. 2006) ("maintenance and champerty of personal
injury tort claims has been forbidden based on a policy that
protected the injured party so that an unrelated third-party
cannot reap a windfall by paying the injured party a pittance
for the claim and then prosecute litigation for injuries that
the party never suffered" (internal marks omitted)); *Odell v.*
*Legal Bucks, LLC*, 665 S.E.2d 767, 773 (N.C.App. 2008) ("These
doctrines are intended to prevent the interference of strangers
having no pretense of right to the subject of the suit, and
standing in no relation of duty to the suitor." (internal marks
omitted)).

*Professional Staff Nurses Ass'n v. Dimensions Health Corp.*, 110
Md.App. 270, 282 (1996) (quoting *Montgomery County v. Meany*, 34
Md.App. 647, 650 (1977)).

Plaintiffs point to no evidence that Defendants "loaned"
Ms. Bartos money for her appeal with any malicious intent toward
their business interests, nor do they specifically identify the
interests that were implicated. Ms. Gordon-Zupancic testified
at her deposition that the money was intended to be a loan, but
that it was forgiven after Plaintiffs prevailed on appeal
because Ms. Bartos was in failing health and ultimately died.
(ECF No. 49, Ex. 6, at 167-68). At the time the loan was made,
moreover, both Defendants and Ms. Bartos had already noted an
appeal. Plaintiffs speculate that Ms. Bartos only appealed
because Defendants urged her to do so. "Such unsupported
speculation," however, "is insufficient to defeat the
defendants' properly supported summary judgment motion."
*Emmett*, 532 F.3d at 308.

### 2. The Zupancic Letter

Defendants argue that, assuming the Zupancic Letter
constituted an intentional and willful act calculated to cause
damage to Plaintiffs in their lawful business, there is no
evidence that it caused any damage.

The Zupancic Letter was received by St. Mary's County
officials on or about November 5, 2007. The letter focused

largely on "the fact that the [P]roperty contains a portion that is an illegal parcel of record," and promised heightened scrutiny of "building permit and [boundary line adjustment plat] processes." (ECF No. 45, Ex. 49). By that time, however, Plaintiffs had already submitted a boundary line adjustment plat for approval, and approval was granted by LUGM on November 28, 2007. Moreover, it is undisputed that Ms. Ballard and Ms. Schmidt, the officials primarily responsible for processing Plaintiffs' applications at that point, had no knowledge of the letter. Plaintiffs argue that this fact "is not conclusive as to whether [other] County officials were influenced by their actions," and that "one only need look to [the Zupancic Letter] to see there are very real issues of material fact as to what extent the County was influenced by them." (ECF No. 45, at 34). The letter itself is plainly not revealing of the effect it had on the recipients, and although Plaintiffs testified at their depositions that the letter "slowed down getting a subdivision deed" (ECF No. 45, Ex. 48, at 28), it is unclear how it actually did. Indeed, Plaintiffs gained approval of their boundary line adjustment plat just twenty-one days after the letter was sent, and they still had not resolved the ongoing problems with the septic system and variance request that prevented them from having their building permit application approved.

### 3.  Publication of the Website

Similarly, assuming Defendants' publication of www.theretainercheck.com constituted wrongful conduct, there is no indication that it had any effect on Plaintiffs' business ventures.  In their response to Defendants' motion to dismiss, Plaintiffs claimed that the website was published "after January 31, 2008."  (ECF No. 8, at 8).  The evidence supports that Ms. Ballard and Ms. Schmidt were primarily involved in processing Plaintiffs' application at that time.  Ms. Ballard specifically denied having any knowledge of the website (ECF No. 40, Ex. 10, at 53-54), and there is no evidence suggesting that Ms. Schmidt, Ms. Chaillet, or any other county employee was aware of it.  All three witnesses testified that no one in their respective departments "attempted to delay or impede approval of the building permit" (ECF No. 40, Ex. 3, at 136; *see also* Ex. 8, at 80-81; Ex. 10, at 52-54).

### 4.  Defendants' Other Contact with County Officials

While Plaintiffs further contend that various communications by Defendants with county personnel interfered with their efforts to rebuild on the Property, the evidence they cite reveals that some of these communications occurred outside of the relevant time frame.  These communications include "telephoning Jennifer Ballard in 2009 and 2010 and meeting with her in person in 2010."  (ECF No. 45, at ¶ 77).  The evidence

reflects that Defendants' contact with Ms. Ballard occurred primarily in March 2009 and February 2010. (ECF No. 45, Ex. 13, at 98-105); Ex. 23, at 124).[16] Plaintiffs filed their complaint, however, on February 17, 2009, and have not filed a supplemental complaint; thus, conduct occurring after the time the complaint was filed may not provide a basis for liability. Plaintiffs further alleged that Defendants contacted their surveyor, Nokelby Surveying, Inc., "on more than one occasion about [Plaintiffs] and the Property." (*Id*. at ¶ 78). The evidence reflects that this contact occurred in November 2005 (ECF No. 45, Ex. 13, at 96), prior to the February 17, 2006, date.

Plaintiffs further cite contact Ms. Gordon-Zupancic had with David Chapman, another county official, in June 2006, but the evidence they cite does not support their interference claim. Ms. Gordon-Zupancic related at her deposition that she spoke with Mr. Chapman at some point after the state court

---

[16] Ms. Ballard testified at her deposition that she initially spoke with Ms. Gordon-Zupancic, by telephone, in 2008. On that occasion, Ms. Gordon-Zupancic inquired as to "whether or not the fact that [the Property is] in an otherwise protected area for floodplain would stop anyone from building on it," and Ms. Ballard responded, "They can develop, but they can't get federally subsidized flood insurance, which might . . . stop a lender from agreeing to lend, like [a] financial mortgage." (ECF No. 45, Ex. 55, at 36). Ms. Ballard further testified that Ms. Gordon-Zupancic did not "tell [her] why she wanted that information," that she "wasn't even aware of the lawsuit until 2010," and that she had no further contact with Defendants until 2010, after the instant suit was filed. (*Id*. at 36-37). The 2008 contact clearly does not support a claim of tortious interference with prospective advantage.

litigation commenced related to local ordinances regarding boundary line adjustment plats. (ECF No. 45, Ex. 13, at 107-09). Her testimony makes no mention of either the Property or Plaintiffs' efforts to build on it. Plaintiffs additionally cite Defendants' contact with LUGM Director Denis Canavan and Deputy Director Phil Shire, both of whom received the Zupancic Letter. In support of these claims, they cite the deposition testimony of both Defendants. Ms. Gordon-Zupancic, however, denied having any contact with Mr. Shire (ECF No. 45, Ex. 13, at 98) and was not asked about any contact with Mr. Canavan, and the cited portion of Mr. Zupancic's testimony does not reveal that he had any contact with these individuals. To the extent Plaintiffs cite their receipt of the Zupancic Letter itself, that claim cannot prevail, as previously discussed.

In sum, Plaintiffs encountered numerous obstacles to obtaining a building permit on the Property. While Defendants clearly contributed to their hardship, the evidence does not support that their conduct, at least during the relevant time frame, constituted tortious interference with prospective advantage. Accordingly, Defendants' motion for summary judgment will be granted.

## IV. Conclusion

For the foregoing reasons, Plaintiffs' motion to compel deposition testimony and for leave to request production of

documents will be denied, and Defendants' motion for summary judgment will be granted.  A separate order will follow.

                            _____/s/_____
                            DEBORAH K. CHASANOW
                            United States District Judge